UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ST. PAUL'S FOUNDATION, SHRINE OF ST. NICHOLAS THE WONDERWORKER, PATRON OF SAILORS, BREWERS, AND REPENTENT THIEVES, and MARBLEHEAD BREWING CO. LLC, BRIAN ANDREW BUSHELL *in religion,* FATHER ANDREW, individually, and as Protos of ST. PAUL'S FOUNDATION, and Father Guardian of the SHRINE OF ST. NICHOLAS, <br><br> Plaintiffs, <br><br> v. <br><br> FBI SPECIAL AGENT CHAD OAKES, in his individual and official capacities, VA OIG SPECIAL AGENT ROBERT BOSKIN, in his individual and official capacities, FORMER FBI SPECIAL AGENT JOSEPH R. BONAVOLONTA, in his individual and official capacities, FEDERAL AGENTS 1-10, in their individual and official capacities, the UNITED STATES DEPARTMENT OF JUSTICE, the TOWN OF MARBLEHEAD, and the MARBLEHEAD MUNICIPAL LIGHT DEPARTMENT, <br><br> Defendants. | Civil Action No.: _____ <br><br><br><br><br><br> **VERIFIED COMPLAINT AND JURY DEMAND** |

## NATURE OF THE ACTION

1. This case involves the Town of Marblehead and the Federal Government's coordinated efforts to prevent Plaintiff Father Andrew and the religious organizations under his oversight from engaging in protected religious activity within Marblehead's borders. Marblehead did everything in its power to prevent Plaintiffs from constructing their house of worship, while making it easy for other religious organizations to get those same approvals. When Plaintiffs

kept insisting on exercising their religious rights, Marblehead officials escalated to spreading lies about Plaintiffs to federal law enforcement agencies among others.

2.     The COVID-19 Fraud Enforcement Task Force ("CFETF") was established by then-U.S. Attorney General Merrick B. Garland in May 2021 and the Department of Justice ("DOJ"). Federal agents in the Boston area became a part of CFETF and prosecutors under direction of former U.S. Attorney for the District of Massachusetts, Rachel Rollins, investigated and prosecuted Plaintiffs based on these lies, culminating in a pre-dawn raid on Plaintiff Father Andrew's place of worship, taking Father Andrew away in handcuffs while actively engaged in religious exercise and preventing him access to his prayer rope, i.e., rosary, or a Bible and, while caged in the federal building's basement while then-U.S. Attorney Rollins conducted her formal press conference for assembled media about the subject arrest, only offered Fr. Andrew food that violated the Orthodox Catholic monastic dietary practices. After coming to realize Plaintiff Father Andrew was sincere in his religious beliefs, that Father Andrew was a genuine Orthodox monk, and neither Father Andrew nor the religious organizations under his oversight were "frauds", the DOJ had no choice but to dismiss all charges against Defendants "in the interests of justice."

3.     Congress explicitly recognized the importance of protecting religious expression from government interference and enacted multiple statutes that widen the scope of religious protections even beyond the broad protections granted in the Constitution. The Religious Freedom Restoration Act ("RFRA") and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") limit the government's ability to place burdens on religious exercise, and the Freedom of Access to Clinic Entrances ("FACE") Act protects access to places of religious worship.

4. Congress passed these laws with the express purpose of preserving the religious rights that Defendants so flagrantly violated. Because Defendants acted in clear disregard of these statutory protections, Plaintiffs are entitled to relief from this Court.

## JURISDICTION & VENUE

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because Plaintiffs assert claims arising under federal law—specifically, violations of 42 U.S.C. § 2000bb *et seq.*, 18 U.S.C. § 248 (a), 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, and 42 U.S.C. § 2000cc.

6. This Court has personal jurisdiction over the individual Defendants because each has sufficient minimum contacts with this District as described herein, including that each of the individual Defendants regularly conducted business or other substantial activities in the District. This Court has general personal jurisdiction over the town of Marblehead because it is located and operates entirely within the District.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

8. Plaintiff the Reverend Father Brian Andrew Bushell ("Father Andrew") is an individual and Orthodox monk who resides at 12 Conant Road, 22 Marblehead, Massachusetts 01945, a religious residence known as Egypt House.

9. Plaintiff St. Paul's Foundation ("St. Paul's") is a Delaware religious non-profit, non-stock corporation that supports Orthodox Christian missions worldwide, including, formerly, humanitarian and church operations in Israel, Palestine, Jordan, and Poland (for Ukrainian refugees), religious education programs, and the construction of Orthodox churches and shrines.

St. Paul's holds 26 U.S.C § 501(c)(3) designation and tax-exempt status, as wells as a group ruling, from the IRS effective 2011.

10. Plaintiff Shrine of St. Nicholas the Wonderworker, Patron of Sailors, Brewers & Repentant Thieves ("St. Nicholas") is a Massachusetts religious nonprofit corporation, and the fee simple owner of the real property located at 120 and 124 Pleasant Street, Marblehead, Massachusetts.

11. Plaintiff Marblehead Brewing Co. LLC is Massachusetts corporation (the "Monastic Brewery"), subsidiary of St. Paul's Foundation, and a tenant of St. Nicholas.

12. The United States Department of Justice is a department of the government of the United States of America ("DOJ") as defined in 42 U.S.C. § 2000bb(b)(2).

13. Defendant Town of Marblehead ("Marblehead") is a municipality located in Essex County, Massachusetts.

14. Defendant Marblehead Municipal Light Department, formerly known as the Marblehead Gas Light Company, a Massachusetts municipal corporation ("MMLD"), is under the sole control of the Marblehead Board of Light Commissioners who hold the charter at the pleasure of the Marblehead Board of Selectman. The MMLD is the sole provider of the electrical utility to the Town of Marblehead and its residents.

15. Defendant Joseph R. Bonavolonta is a former FBI Special Agent who coordinated the investigation and arrest of Father Andrew and made false public statements. Defendant Bonovolonta is or was a member of, or works or worked closely with, the CFETF to marshal the resources of the Department of Justice in partnership with agencies across government to enhance efforts to combat and prevent pandemic-related fraud. He is sued in his individual capacity.

16. Defendant Chad Oakes is an FBI Special Agent. Defendant Oakes is a member of, or works closely with, the CFETF. He is sued in his individual capacity.

17. Defendant Robert Boskin is a Veteran's Affairs Special Agent in the Office of the Inspector General of the U.S. Department of Veteran's Affairs. Defendant Boskin is a member of, or works closely with, the CFETF. He is sued in his individual capacity.

18. Defendants Federal Agents 1-10 are other agents of the CFETF whose identities are currently unknown and who participated in the arrest of Plaintiff Father Andrew and raid of 12 Conant Road and 22 Endicott Ave, Marblehead Massachusetts 01945 on October 13 2022.

## STATEMENT OF FACTS

I. **Plaintiffs are Individuals and Organizations of Faith.**

19. Orthodox Christianity is the second-largest branch of Christianity, tracing its origins directly to the first century.

20. Orthodox Christians follow a traditional way of Christian life following the canons of the Seven Ecumenical Councils.

21. St. Paul's is an Orthodox Christian monastic institute. Since 2017, St. Paul's has been working to establish an Orthodox Christian monastic shrine dedicated to St. Nicholas, one of Christianity's most venerated saints, under the direction of Father Andrew pursuant to canonical right. St. Nicholas is located at 120 and 124 Pleasant Street, Marblehead, Massachusetts 01945. Once completed, St. Nicholas and its facilities will serve as a major Orthodox Christian spiritual center for New England, the United States, and the faithful everywhere.

22. St. Nicholas operates as an Orthodox Catholic monastic shrine and place of public worship in the ancient tradition of Eastern Christianity.

23. The Orthodox Church in America and the Union of Orthodox Jewish Congregations validated St. Nicholas' religious nature by filing amici curiae in federal court supporting religious liberty claims of St. Nicholas and St. Paul's against Marblehead in a claim under RLUIPA in 2019 (the "2019 RLUIPA Case").

24. Goodwin Procter LLP, one of Boston's most prestigious law firms, represented St. Nicholas pro bono in the 2019 RLUIPA Case, demonstrating the legitimacy of the religious claims.

25. St. Nicholas conducts substantial interstate commerce, receiving donations from Orthodox faithful outside of the Commonwealth of Massachusetts, hosting pilgrims from across New England, the United States, and internationally, and providing religious items nationwide to the faithful.

26. Federal officials know St. Paul's and St. Nicholas participate in interstate and international commerce because at the time of the October 13th raid, Dr. Georgios Kordis, one of the world's foremost iconographers, was resident at Egypt House after flying in from Athens, Greece, on what is known as an O Visa (a type of Visa reserved for individuals of extraordinary ability). Dr. Kordis, in addition to painting icon frescoes in churches globally, has taught at Yale University and Notre Dame, among other well-regarded institutions. One of his icons, of St. Dionysius the Areopagite, patron saint of judges, hangs in the chambers of a judge of the United States Appeals Court for the Second Circuit to remind judges, prosecutors, and attorneys of the "omnipotent goodness of the Divine weakness."

27. The monastic brewery is owned by St. Paul's and a tenant of St. Nicholas. Orthodox and Roman Catholic monks have been making beer according to religious requirements for over 1,700 years to support a rigorous regimen of religious dietary and fasting

restrictions.  Before establishing St. Nicholas, Father Andrew traveled to Europe to learn the art of monastic brewing from Trappist monks.

28. While greatly impaired due to the activities of Marblehead and the federal government that are the subject of this Verified Complaint, in the long tradition of monastic breweries, such as Orval, Westvleteren, Westmalle, Rochefort, Zundert, and Achel, all locations where Father Andrew studied brewing. Father Andrew is the brewer at the monastic brewery.

29. Father Andrew is an Orthodox Christian monk who has devoted his entire adult life to religious service. He graduated *magna cum laude* from the Pontifical Gregorian University, an extra-territorial part of the Vatican in Rome, in 1996. Prior to founding St. Nicholas, he spent approximately 8 years as a member of a monastery on Mount Athos.

30. Father Andrew lives according to the traditional monastic precepts of poverty, chastity, obedience, and stability. Under his vow of poverty, he owns no personal property and has dedicated his life to building religious institutions that serve God and the Orthodox Christian community. Since 2011, he has served as Protos of St. Paul's, and, since 2017, Father Guardian of St. Nicholas.

## II. The Town of Marblehead Has Taken Every Possible Step to Drive Defendants Out Because of Targeted Animus Towards Orthodox Christianity.

31. From the outset, Marblehead viewed Plaintiffs as fraudulent, secular organizations posturing as religious organizations for the tax or other benefits associated therewith. Based on rumor and animus, Marblehead acts from the unfounded position that Father Andrew is not truly a religious figure. This discriminatory perspective has tainted every aspect of

Marblehead's actions toward Defendants in violation of Marblehead's own practices and procedures.

32. Marblehead is intent on preventing Defendants from establishing a house of worship in town. Marblehead officials have taken every opportunity to use their regulatory authority as a weapon to drive Defendants out of town because of their association with Orthodox Christianity. Because Marblehead has prevented Defendants from developing a house of worship suitable for the religious mission that is the basis for their existence, Father Andrew has not been able host liturgical worship, communal dinners, or other religious activities at St. Nicholas, substantially burdening the ability to practice and spread this religion.

33. Marblehead weaponized its regulatory authority as a pretext for religious animus. Marblehead coordinated strategy to deny, delay, and disturb any progress of the construction of St. Nicholas and the operation of the monastic brewery because of religious animus and to prevent Plaintiffs' religious activities.

34. In contrast to Marblehead's adversarial approach to Plaintiffs' regulatory applications, Marblehead freely grants similarly situated religious organization's regulatory applications with little issue and by a different procedure.

35. Four examples highlight this odious discrimination: First, the Marblehead Building Commissioner embarked on a mission to solicit assistance from other agencies in denying a building permit to St. Nicholas. Second, Marblehead arbitrarily and capriciously rejected St. Nicholas compliant electrical service designs for years, preventing St. Nicholas from opening to the public. Third, the Marblehead Board of Assessors has created one hurdle after another to bar St. Nicholas from recognition of tax exemptions due St. Nicholas by right, while providing religious organizations that rightfully qualify for such exemptions only on an

apportioned basis, *i.e.,* less than 100% of the property qualifies as to the entirety of the property owned by the subject religious organization. Fourth, the Marblehead Health Department and Building Department refused to allow St. Nicholas to sell the monastic beer at Church events without a commercial kitchen; while, as only one of several examples, providing the Roman Catholic parish, Our Lady Star of the Sea with a full food service license and allowing the Church to sell wine at Church events without a commercial kitchen. The Roman Catholic parish also receives a full tax exemption, while renting out several classrooms and a large exterior area to a for-profit nursery school, in violation of Massachusetts law.

### A. The Marblehead Building Commissioner Manufactured Reasons to Deny a Permit to the Church to Operate a Brewery on Church Property.

36. Marblehead's crusade against Defendants began in 2017 with its Building Commissioner working tirelessly to prevent St. Nicholas from receiving a permit to construct and operate a monastic brewery and serve beer on Church property.

37. First, the Commissioner solicited the Marblehead Health Department to inspect the location and find reasons to deny the permit. The Health Department initially refused because St. Nicholas' church events fall under the Potluck Act; ostensibly outside of Health Department purview.

38. Undeterred, the then-Commissioner wrote to the Massachusetts Alcoholic Beverage Control Commission ("ABCC") to inquire whether *they* could help him in his quest to deny St. Nicholas' permit. The ABCC spoke with the Health Department on Marblehead's behalf and convinced them to inspect the refectory at St. Nicholas to identify deficiencies which would later form the basis for suspending St. Nicholas' building permit.

39. This course of conduct was unlike how Marblehead treated any other similarly situated religious organization. While working collaboratively with other religious organizations

to find reasons to grant their permits, such as the food service permit issued to Our Lady Star of the See, discussed above. Marblehead worked against Defendants every time they sought a regulatory permit or determination.

### B. Marblehead Has Arbitrarily and Maliciously Rejected St. Nicholas' Compliant Electrical Service Designs.

40. Since 2017, St. Nicholas has sought approval from the Marblehead Municipal Light Department ("MMLD"), for planned electrical work at St. Nicholas.

41. At the first opportunity, the MMLD refused to participate in good faith. In the interests of brevity, Marblehead's wire inspector failed to show up to the planned meeting among St. Nicholas, Marblehead, and the MMLD.

42. Finally, in May 2021, the Marblehead wire inspector issued a letter rejecting St. Nicholas' proposed design of the electrical service stating that the proposal, despite (a) having prior knowledge of the design for a period of approximately five months and (b) the fact the electrical diagram had been prepared by an electrical engineer then-working on nuclear power plants, was in violation of the State electrical code. Marblehead regulators refused to work collaboratively with St. Nicholas' toward a solution, as they had done with other similarly situated religious and non-profit organizations and, instead, leveraged their regulatory processes to frustrate St. Nicholas' efforts to build a house of worship.

43. St. Nicholas appealed the Marblehead wire inspector's determination to the Board of Electricians' Appeals ("Board"), a State agency. The Board squarely reversed the Marblehead wire inspector's decision and approved the service as originally designed.

44. St. Nicholas was hopeful to get started on building their house of worship, but not one month later, Marblehead and the MMLD declined to approve the service installation, citing purported "parking concerns" and access issues to the transformer site. Again, instead of

working with St. Nicholas to permit and approve their service plans, Marblehead and the MMLD actively worked against St. Paul's to deny the installation.

45. It was not until January 2022, when Marblehead and the MMLD allowed the electrical installation because the Board unanimously overturned the ruling of the Marblehead wire inspector; however, unlike other houses of worship in Marblehead, the MMLD required St. Nicholas to pay half the cost of the transformer. The transformer finally arrived six months later, on or about July of 2022. The MMLD refused to notify St. Nicholas staff it had arrived; calls and emails inquiring as to status of the shipment to the Town Administrator of Marblehead and the MMLD were not returned. The transformer and basic electrical service was not installed until July 2024.

46. St. Nicholas is currently appealing Marblehead's most recent, baseless denial of electrical design to the Board a second time, all despite St. Nicholas' good faith efforts to work with Marblehead and the MMLD.

### C. Marblehead Attempts to Compel Father Andrew to break confessional seal and reveal names of worshippers.

47. On or about September 2023 and October 2025, Town Counsel for Marblehead filed motions to compel Father Andrew to reveal the names and identities of Orthodox Christians and others who attend services at, and/or make pilgrimages to visit St. Nicholas and participate in Orthodox programs in Marblehead, or come for confession, spiritual direction, or other worship.

### III. Marblehead Lied About Plaintiffs to the Federal Government, Prompting a Baseless Investigation and Prosecution.

48. Based on their animus for Plaintiffs' religious operation, on information and belief, Marblehead officials made false reports to the Federal Bureau of Investigations that

Father Andrew was not a real monk and none of the organizational Defendants were legitimate religious organizations. These and other false allegations contributed to the Federal Government's decision to investigate Father Andrew, and the organizational Defendants' use of COVID-19 Pandemic funds to support operations.

49.     These insidious lies achieved their goals. On or about October 13, 2022, as a direct result of the false allegations perpetuated by Marblehead, federal prosecutors filed a complaint alleging that Father Andrew was perpetrating a multimillion-dollar fraud. Of course, those allegations were patently false and the case was eventually dismissed by prosecutors "in the interests of justice." But the stain associated with federal fraud allegations remains. St. Paul's lost the support of major donors and Father Andrew's reputation has been irreparably harmed. The allegations in the criminal complaint were precisely targeted to prevent Defendants from continuing to operate in Marblehead and to destroy Father Andrew's life and to prevent Father Andrew from ministering to others according to his faith.

IV.     **The Federal Defendants Orchestrated an Illegal Pre-Dawn Raid on Father Andrew's Place of Religious Worship.**

50.     On October 13, 2022, sometime after 4:30 AM, armed federal agents in tactical gear conducted a military-style raid on St. Nicholas' rectory, the Annunciation House monastic complex, while Fr. Andrew was engaged in morning prayers before the altar. Members of the CFETF, including Defendants Bostin, Oakes, and Federal Agents 1-10, who are unknown to Plaintiffs at this time, at the direction of Defendant Bonavolonta, interrupted sacred religious activities, treating a house of worship like a drug den and showing complete disrespect for Orthodox Christian religious practices and the sanctity of religious space.

51.     Father Andrew was handcuffed, arrested, and taken into custody.

52. The timing and manner of the arrest were designed to maximize psychological pressure and public humiliation, not to serve any legitimate law enforcement purpose. Agents did not make any effort to coordinate a voluntary surrender with Father Andrew, even though Plaintiffs would have cooperated with the federal investigation had they been given the opportunity and none of them posed a flight risk. The agents knew there was a less restrictive means of taking Father Andrew into custody, but they elected not to pursue it to maximize intimidation and terror at the expense of religious practice.

53. The United States Attorney at the time, Rachael Rollins, held a press conference with Special Agent Bonavolonta, where they made false and defamatory statements outside of the criminal complaint to attack the legitimacy of St. Paul's, St. Nicholas, and Father Andrew's religious practice. On information and belief, these statements were made to enhance then-U.S. Attorney Rachael Rollins' social standing because she knew *she* was a target of an ethics investigation by DOJ. To this day, DOJ has on its website a press release regarding Father Andrew that contains false and defamatory statements that burden his religious practice.

## COUNT ONE
**Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc**
**(Against: Town of Marblehead)**

54. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

55. The denial of permits by Marblehead constitutes discriminatory exercise of land use and zoning laws.

56. By imposing and implementing Marblehead's land use and zoning laws and regulations in the manner described above, Defendants imposed a substantial burden on the religious exercise of the Church in violation of 42 U.S.C. § 2000cc(a)(1).

57. The imposition of this substantial burden on the religious exercise of the Church by Defendants is not in furtherance of a compelling governmental interest, nor is it the least restrictive means of furthering a compelling governmental interest, as required by 42 U.S.C. § 2000cc(a)(1).

58. By virtue of the foregoing conduct, Defendants violated the Church's rights under RLUIPA, 42 U.S.C. § 2000cc(a), and Defendants are, accordingly, entitled to such relief as the Court finds to be appropriate including, but not limited to, declaratory relief, injunctive relief, compensatory damages, and the costs and expenses of this action.

### COUNT TWO
### Violation of 42 U.S.C. § 1983 (First, Fifth, and Fourteenth Amendments, *Monell,* Pattern or Practice, and Retaliation)
### (Against: Town of Marblehead)

59. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

60. Plaintiffs are members of a protected class based on their religious affiliation as Orthodox Christians.

61. Marblehead, acting under color of state law, deprived Plaintiffs of rights secured by the Free Exercise and the Free Association Clause clauses of the First Amendment to the United States Constitution.

62. Marblehead, acting under color of state law, deprived Plaintiffs of rights secured by the Fifth Amendment to the United States Constitution.

63. Marblehead, acting under color of state law, deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution.

64. As alleged throughout, Marblehead weaponized regulatory authority like permitting decisions and otherwise less formal government customs to treat Plaintiffs differently

than other similarly situated religious individuals and organizations in violation of the Plaintiffs' Fourteenth Amendment rights.

65. Marblehead's actions violating Plaintiffs' First, Fifth, and Fourteenth Amendment rights were motivated by animus against Orthodox Christianity. These actions were regulatory actions, like permitting decisions, or otherwise less formal governmental customs.

66. As alleged throughout, Marblehead use of regulatory authority like permitting decisions and otherwise less formal government customs deprived Plaintiffs of the ability to freely practice Orthodox Christianity in violation of their First Amendment rights.

67. Marblehead took the alleged actions with the intent of depriving Plaintiffs of their right to free exercise of religion and their actions were the cause in fact of that alleged deprivation.

68. Marblehead actions violating Plaintiffs First Amendment rights were, similarly, regulatory actions, like permitting decisions, or otherwise less formal governmental customs.

69. By virtue of the foregoing conduct, Defendants violated Plaintiffs' rights under the 42 U.S.C. § 1983 and the First, Fifth, and Fourteenth Amendments. Accordingly, Plaintiffs are entitled to compensatory damages, including but not limited to the costs and expenses of this action, punitive damages, and any such relief as this Court finds to be appropriate.

### COUNT THREE
### Violation of 42 U.S.C. § 1985(3) (Conspiracy to Interfere with Civil Rights)
### (Against: Town of Marblehead)

70. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

71. Defendants conspired to deprive Plaintiffs of constitutional rights based on religious animus.

72. The conspiracy involved: agreement among Defendants across Marblehead and MMLD municipal departments and agencies; overt acts including coordinated denials and blocked settlements; canceling permits immediately after federal arrests; class-based discriminatory animus against Orthodox Catholics; deprivation of equal protection and equal privileges.

73. At least one conspirator acted under color of state law.

## COUNT FOUR
### Violation of 42 U.S.C. § 1986 – Neglect to Prevent Conspiracy
### (Against: Town of Marblehead)

74. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

75. Supervisory elected officials, appointees, and employees of Defendants had knowledge of the § 1985 conspiracy through their supervisory positions.

76. Each such supervisor possessed power to prevent the conspiracy but neglected or refused to exercise it.

77. The supervisory neglect is a proximate caused Defendants' injuries.

## COUNT FIVE
### Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*
### (Against: Defendants Bonovolonta, Boskin, Oakes, Federal Agents 1-10, and DOJ)

78. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

79. Father Andrew is an Orthodox Christian monk and each of the organizations under his oversight is fostered by Orthodox Christian beliefs and practices. Orthodox Christianity is a system of religious belief within the meaning of the Religious Freedom Restoration Act.

80.     The arrest of Father Andrew by Defendants at St. Paul's rectory on October 13, 2022 placed a significant burden on Father Andrew's exercise of religion in violation of his rights embodied in the Religious Freedom Restoration Act, 42 U.S.C. §2000bb *et seq.*

81.     There was no compelling interest furthered by the arrest and raid because there was no basis to believe Father Andrew had weapons, was flight risk, would resist arrest or would present any danger to the officers or the community. The foregoing facts were confirmed when the government only required Father Andrew to sign a signature bond to be released from custody. The Defendants acted with animus against the Fr. Andrew's religious practice, which Defendants discounted and ignored. There can be no doubt, had Father Andrew been a Roman Catholic priest, a rabbi, a Protestant minister, a Muslim imam, or any other religious figure, Defendants would have respected his religious rights.

82.     Defendants failed to use the least restrictive means possible in their arrest by neglecting to organize a voluntary surrender and, instead, deliberately conducting a raid at Father Andrew's place of religious worship, interrupting his religious exercise. In fact, the raid orchestrated by Defendants could be characterized as the *most* restrictive means possible, designed to maximize fear and intimidation.

83.     By virtue of the foregoing conduct, Defendants violated Father Andrew's rights under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* Accordingly, Father Andrew is entitled to compensatory damages including, but not limited to, the costs and expenses of this action, punitive damages, and any such relief as this Court finds to be appropriate.

**COUNT SIX**
**Violation of Access to Places of Religious Worship, 18 U.S.C. § 248 (a)**
**(Against: Defendants Bonovolonta, Boskin, Oakes, and Federal Agents 1-10)**

84. Plaintiffs incorporate each of the allegations above as though fully set forth herein.

85. Father Andrew is an Orthodox Christian monk. Orthodox Christianity is a system of religious belief within the meaning of 18 U.S.C. § 248 (a). Fr. Andrew engaged in various forms of religious exercise at St. Nicholas' rectory, Annunciation House (comprised of Emmaus House at 22 Endicott Avenue and Egypt House at 12 Conant Road), the site of the raid upon Fr. Andrew's person.

86. Defendants conspired to use force and threats of force to intimidate and prevent Father Andrew from freely practicing his religion at Emmaus House by planning the arrest in the most invasive and destructive manner possible.

87. Defendants forcibly removed Father Andrew from his place of religious worship under force and threat of force, during which time Father Andrew was actively engaged in religious exercise.

88. Defendants further prevented Fr. Andrew from accessing his place of worship upon his release from federal custody, denying him religious comfort in his most trying time.

89. By virtue of the foregoing conduct, Defendants violated Father Andrew's right of access to places of religious worship under 18 U.S.C. § 248(a). Accordingly, Father Andrew is entitled to compensatory damages including, but not limited to, the costs and expenses of this action, punitive damages, and any such relief as this Court finds to be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Father Andrew, St. Paul's, St. Nicholas, and the Marblehead Brewing Co. LLC respectfully request this Court grant the following relief:

1. Judgment in favor of Plaintiffs on all Counts;

2. Nominal damages, compensatory damages, consequential damages, and punitive damages, in each case, as appropriate;

3. Attorney's fees;

4. Equitable remedies; and

5. Any other relief that this Court deems just and proper.

## JURY DEMAND

WHEREFORE, Plaintiffs demand trial by jury on all claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

DATED: October 10, 2025

/s/Tracey M.A. Stockton
Tracey M.A. Stockton (MA Bar No.: 568495)
Admitted before the United States District Court, Massachusetts District

*Counsel for Plaintiffs*

Verified Complaint - Page 19 of 19

## VERIFICATION

I, the Reverend Father Andrew (Brian Andrew Bushell), declare that I am Protos (Executive Chairman) of St. Paul's Foundation, the Father Guardian of the Shrine of St. Nicholas, and the Brewer of the Marblehead Brewing Co. LLC and I have read the foregoing Verified Complaint, and the allegations in the Verified Complaint are true, based on my personal knowledge, except where they are indicated to be based upon information and belief, as to those allegations I am informed and believe them to be true.

I verify under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on October 10, 2025.

_____
Reverend Father Andrew
(Brian Andrew Bushell)